Mrs. Katrina **PAVLIDES**, et al.,
Plaintiffs-Appellants,

v.

**GALVESTON YACHT BASIN, INC.,** et al., Defendants-Appellees,

**AMF Slickcraft Boat Division,** etc., et al., Defendants-Appellees.

No. 83–2003.

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1984.

Rehearing Denied March 8, 1984.

---

Clann & Pearson, Michael K. Clann, Houston, Tex., for Galveston Yacht Basin, Inc.

Butler, Rice, Cook & Knapp, Tom Alexander, Don Fogel, Houston, Tex., for AMF Slickcraft, AMF Robalo & AMF Inc.

Schmidt & Matthews, W. Douglas Matthews, Timothy F. Lee, Houston, Tex., for plaintiffs-appellants.

Appeal from the United States District Court for the Southern District of Texas.

Before GEE, TATE and HIGGINBOTHAM, Circuit Judges.

GEE, Circuit Judge:

On a February Sunday in 1976, Sam Pavlides and four of his chums set out on a fishing trip in Pavlides' Robalo 236 motorboat. Four of them, including Pavlides, never returned: they died while attempting to swim to safety from their swamped boat. The fifth, Anthony Moustakelis, made it to an adjacent oil rig.

On this appeal, the decedents' estates challenge the trial court's conclusion that the manufacturer of the boat, AMF Slickcraft Boat Division, Inc. (AMF) was not strictly liable for defects in design, manufacture or marketing.[1] We conclude that the trial court applied an erroneous measure of the duty to warn, one unduly prejudicial to plaintiffs. Therefore, we remand for the trial court to reconsider the evidence under the correct standard, and to make further rulings as necessary, in accordance with this opinion.

*The Accident: February 1, 1976*

After launching Pavlides' Robalo 236 from the Galveston Yacht Basin, the five fishermen involved in this case filled the boat's fuel tank and motored out into the Gulf of Mexico to fish.[2] They made fast to one oil rig, fished for about 15 minutes, then moved to another—a trip of about five minutes. After some 15 minutes at the second rig, Moustakelis noticed about an inch and a half of water in the stern of the boat, but Pavlides told him not to worry. However, as the boat continued to take on water through the bilge[3] the men became concerned. Pavlides attempted to use the bilge pump and the radio, but neither worked since by then water had flooded the batteries in the rear of the boat. The men then attempted to start the engines and self-bail the boat, as Pavlides had been instructed by the salesman to do should the bilge take on water. They accidentally cast off from the rig with only one engine working; shortly after, the operating engine failed, indicating that water had reached its air intake. Moustakelis testified that at that point they felt it was too dangerous to open the bilge access port and try to identify the problem.[4]

As the now-powerless boat drifted back past the rig, Moustakelis abandoned ship and swam to it. The other four men remained in the boat, trying to bail it manually as it continued to sink by the stern. Three of the decedents then put on life jackets and tried to swim to the rig but were swept back by the current. The fourth, Jack Nikolaides, swam without a life preserver to within a few feet of the rig, but the current prevented him from reaching it. According to Moustakelis' testimony, at that time only the forward portion of the boat was above water, but it had not turned over.

Moustakelis lost sight of the men and the boat as they continued to drift away from him. He could not tell whether the boat

[1] Plaintiffs in this action are the personal representatives and administrators of the estates of the decedents: Paul S. Pavlides, Sam L. Pavlides, Iakovos Nikoliadis and Paul C. Christopher.

 Plaintiffs originally sued Galveston Yacht Basin, Inc. alleging that it negligently launched the decedents' boat without a drain plug; AMF Slickcraft Boat Division, a division of AMF, Inc., AMF Robalo, Robalo Boat Division, a division of AMF, Inc., and AMF, Inc. (collectively "AMF") alleging that AMF was strictly liable for a defect in the design, manufacture or marketing of the R–236; Redwing Boat Company, the dealer who sold the boat, alleging both products liability and negligence; and Evinrude Motor Division and Outboard Marine Corporation, alleging that the boat's motors were defective. AMF cross-claimed against the Yacht Basin.

 Before trial, plaintiffs settled with all defendants except AMF.

[2] Since the accident occurred over a "marine league" (three miles) from shore, the federal courts have jurisdiction under the Death on the High Seas Act, 46 U.S.C. § 761–68 (1971).

[3] The bilge is the space between the double bottoms of a boat. In the Robalo 236 this space was empty.

[4] Expert testimony at trial established that trying to locate the cause of the water entering the bilge and replace the bilge drain plug from either the inside or the outside of the boat would be a very hazardous undertaking once the bilge was flooded.

had capsized or not when he lost sight of it. Moustakelis was rescued several hours later by a private boat and the Coast Guard was then called to the scene. They found the Robalo 236 some six hours after the accident, by which time it had fully capsized. The bodies of two of the decedents were found; the other two are presumed dead. The Coast Guard report lists the causes of death as drowning, with hypothermia a contributing factor due to the 56-degree water temperature.

*The Robalo 236*

Plaintiffs' strict liability arguments require a fairly extensive discussion of the design, manufacture and marketing of the Robalo 236 ("R–236"). The R–236, which went on the market in 1974, was the first "Robalo" designed, manufactured and marketed by AMF. However, the "Robalo" name already enjoyed a wide and excellent reputation: previous "Robalo" models had been made and marketed by the Robalo Company, an individually-owned Florida concern engaged in the manufacture of pleasure boats for deep sea fishing. The Robalo boats made by the Florida concern had acquired a reputation for safety arising from the boats' "fully-foamed" construction, meaning that all of the void spaces in the hull were filled with foam flotation material so that the boats had no void bilge space. This made these Robalos virtually "unsinkable." All models made by the Robalo Company had drain holes in the stern side of the boat designed to allow water which accidentally entered the cockpit or engine well to run out when the boat was slowly moving forward, thus "self-bailing" the boat. Although one of these drain holes, the "sump" hole, was below the waterline, no drain holes on any Robalo

made by the Florida concern led into void bilge space.

AMF acquired the Robalo Company in the early 1970s, shortly after it had acquired the Slickcraft Company, a Michigan-based manufacturer engaged in making boats for fishing on the Great Lakes. The Slickcraft line was not fully-foamed; in these boats the bilge space was wholly or partly void.

AMF merged the corporate structures of Robalo and Slickcraft, but since the two lines sold to distinct markets, AMF continued to market "AMF Robalo" boats and "AMF Slickcraft" boats. However, in response to the request of a fishermen's association that AMF build a 23-foot boat for Michigan lake fishing, AMF decided to market a new model which would resemble the Robalo 230 (a 23-foot, fully-foamed boat) with the addition of a cutty cabin.

The resulting design, which AMF marketed both under the name "Robalo 236" and under the name "Slickcraft 236", was not a fully-foamed boat, but rather had a large void space in the bilge with a through-hull bilge drain in the rear of the bilge below the waterline. The bilge drain could be plugged either from the inside, by reaching in through the bilge access port to the bottom of the bilge (a distance of about three feet), or from the outside, by reaching down between the engines. If the plug was inserted from the inside, it was not visible from the outside, and vice versa.

The void bilge space in the R–236 meant that, unlike all other Robalos, the R–236 was not completely self-bailing.[5] Water which entered the bilge—through the bilge drain or in any other manner—could only be removed normally by operating the bilge pump.[6] The R–236 was not equipped with

5. A "self-bailing" boat is one in which any water entering the boat will run off when the boat is either standing still or moving slowly forward.

6. It would also be possible to remove some water from the bilge by removing the bilge drain plug and running the boat at a speed sufficient for it to "plane"—get up out of the water—since at that point the bilge drain would be above the waterline and some water

would drain out. However, this would not remove all the water from the bilge. As expert testimony at the trial indicated, this would be an unusual and dangerous procedure: it would be very hazardous to remove the bilge drain plug at sea. Also, it would become increasingly difficult to get the boat to plane as the bilge filled with water, and even if the maneuver was successful, it could not remove all the water from the bilge.

an automatic bilge pump that would commence bailing when water reached a certain level in the bilge, nor was it equipped with any warning device to notify occupants of the presence of water in the bilge.[7]

Tests conducted by plaintiffs' expert on Pavlides' R–236 after the accident showed that when the bilge drain plug was removed, the covered, enclosed bilge space would fill with water in about 11 minutes, at which time water would first be visible on deck. Experts on both sides testified that the only way an operator of the R–236 would be aware of water in the bilge before it appeared on deck was that when the boat was underway, it would feel heavy to an experienced sailor.

Once the bilge was filled with water, moreover, there was a good chance that the bilge pump would not function since by that time the batteries might well be flooded—as happened in today's case. The undisputed expert testimony was that it would be extremely difficult and dangerous to attempt to determine the cause of water entering through the bilge or to replace the bilge drain plug from either the inside or outside when water was rapidly filling the cockpit through the flooded bilge. In the post-accident tests, the R–236 filled with water and developed a list to starboard in less than four minutes after water appeared on the deck of the boat.[8] Obviously, water would reach the air intake of the engines, shutting them down, during these few minutes (as happened here).

*Instructions and Warnings Furnished by AMF*

The sales literature furnished by AMF is, to say the least, misleading as to the design of the R–236. The "AMF Robalo 236 Outboard Specifications" in the sales pamphlet state that the R–236 is "85 percent closed-cell foam," suggesting that the boat is foamed to 85 percent of capacity with closed-cell foam. In fact, the evidence showed that the boat is only about 25 percent foamed.[9] The salesman's testimony at trial established that a buyer could not determine how much flotation material there was on the R–236 by examining the boat. Indeed, plaintiffs' expert testified that it would be necessary to cut open the boat to determine what percent of it was in fact foamed.

With the R–236, AMF furnished a "Robalo Owner's Manual," a copy of which was given to Sam Pavlides by the salesman. The Manual does not describe the design of the R–236, unique among Robalos; nor does it mention that the R–236 has a void bilge space, a bilge drain and a bilge drain plug. It does not indicate that the bilge drain plug could come off accidentally; it does not say how an operator is supposed to be aware of the bilge filling with water; it does not state that when water appears on deck in the rear of the cockpit it could well mean that the bilge is flooded and that in consequence the electrical system, including the bilge pump, is in immediate danger of failing and that the engines may shortly fail as well. Nor does it note that replacing the bilge drain plug when the bilge is full of water is a very difficult and hazardous procedure. The only reference in the Manual to "drain plugs" or through-hull openings occurs in Pre-Launch Procedure C[10]:

> Whether you keep your boat in the water during the boating season or remove it after each trip, we advise following a

---

**7.** AMF added automatic bilge pumps to the R–236 model very shortly after the instant accident.

**8.** At this point in the test the four men on board were unable to stop the boat from capsizing. The test was terminated to prevent injury to the crew, the testing facility or the boat.

**9.** Defendants argue that the statement in the specifications means that the foam in the boat is 85 percent "closed-cell" foam and 15 percent some other type of foam. We do not believe that a reasonable person could read the statement as defendants suggest. We note also that defendants have not made any showing that the statement as they interpret it is a true representation of the nature of the foam.

**10.** The drawings accompanying these instructions are reproduced in the Appendix.

routine check list to prevent problems and possible safety hazards.

**1. Through Hull Fittings.** You should be familiar with all through hull fittings (see illustration at right for typical locations). Check each one before launching to make sure no damage has occurred in transit or that no obstructions to ports or openings have resulted from floating debris.

**2. Drain Plugs.** Make certain indicated lower drain plugs are in place. For general locations, see illustrations at right. Generally the outboard motor well upper drain plugs as well as the control tube through drain plug are left out of the drain tubes when under way to allow deck water to flow overboard. Drain plugs can be tightened by turning the center screw clockwise.

These instructions and illustrations refer to Robalo fully-foamed boats and not to the R–236, but could easily be misinterpreted to apply to the R–236 as well. Like the boat illustrated in the Manual, the R–236 has four drain holes in the stern. However, while the only below-waterline hole shown in the Manual is a "sump" hole—which can be left open with no danger—the corresponding below-waterline hole in the R–236 is the bilge drain which, as noted above, poses a serious risk if left unplugged.

The statements in the Manual regarding what to do if water appears in the boat are similarly misleading. The sole instruction on this point states: "[I]f water in the boat appears excessive, open the upper drain plugs."

*Instructions Given by Redwing*

Sam Pavlides brought his R–236 from Fred and Ralph Lester, employees of the Redwing Boat Company. Fred Lester testified at trial that he told Sam Pavlides that the R–236 was "unsinkable." [11] Fred and his brother Ralph took Pavlides out into the Galveston Yacht Basin to demonstrate the boat. Before launching it, they installed the various drain plugs. According to Ralph's deposition: "We told him the boat was self-bailing. We backed it down in the water, got some water on deck, showed Sam that in 30, 40 seconds the water had already dissipated out through the rear drain holes.... The three holes in back.... Q: Above the water line? A: Yes, sir.... We showed him that by slowly accelerating, the water runs aft." Fred Lester also testified that they told Pavlides that the bilge would also self-bail if the boat was "under forward motion" so he should start the engines if water was coming in the bilge.

The Lesters also explained the boat's electrical system, including the bilge pump switch, to Pavlides. According to their testimony, however, neither of the Lesters told Pavlides that the bilge plug could fall out accidentally and that the bilge would then fill with water in a very short period of time. Nor, according to their testimony, did they tell him how he could know if the bilge was filling with water. They did not warn him of the specific dangers which would be the almost inevitable result of the bilge's filling: that the bilge pump might short out and that in a few minutes water would reach the air intake of the engines, causing them to fail. They did not tell him—because, so they testified, they did not know—that if the bilge flooded the R–236 would fill with water in less than four minutes after water appeared on deck.

*The Trial Court's Findings of Fact and Conclusions of Law*

■ The trial court found that the boat filled with water because it had lost its bilge drain plug. The court apparently credited plaintiffs' evidence as to the speed with which the boat would submerge when the bilge drain plug came out since the court's findings accord with the timing of the sequence of events shown in the plaintiffs' tests. The court found that the bilge drain plug had fallen out about ten minutes

---

**11.** Defendants argue that in fact the R–236 did not sink to the bottom and that Lester did not tell Pavlides that the boat would not submerge. We note that *Webster's Dictionary* uses the two terms interchangeably as synonyms, as did the trial court at several points during this case.

before Moustakelis first noticed water in the rear of the boat—or shortly before the boat arrived at the second rig. The court further found that the bilge pump's failure to function was the result of rising water reaching the batteries or electrical connections in the rear of the boat and that the one engine that did start failed because water had reached its air intake.

The court also found that the R–236 was not defective in either design or manufacture and that when the men left the R–236 "it was still level and largely above water." Finally, the court found that the decedents "lost their lives by failing to follow the instructions given, especially by failing to locate and replace the missing bilge plug, and by leaving the still-floating boat." [12]

After setting out the law of strict liability in general and noting that strict liability is available in admiralty, the court observed that the plaintiffs had not established any specific defect in the design or manufacture of the Robalo 236. As to the alleged failure to warn, the trial court stated, "A manufacturer has the right to assume that persons using the product know how it is to be used"; and held that

> Plaintiffs failed to carry their burden of proof that Defendant AMF breached any duty to warn or to instruct Plaintiffs concerning the use or dangers of Defendant AMF's product. The owner's manual furnished by AMF, the Texas Skippers' Course furnished by Redwing and the personal instructions to Sam Pavlides by salesman Fred Lester were sufficient as as a matter of law.

### Design and Manufacturing Defects

As we stated in *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1106 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974): "the determination that a product is unreasonably dangerous ... means that, on balance, the utility of the product does not outweigh the magnitude of the danger.... In other words,

it must be so dangerous that a reasonable man would not sell the product if he knew the risk involved." 493 F.2d at 1087–88 (citations omitted). In the instant case, the parties presented conflicting expert testimony as to whether the R–236 was defective in its design or manufacture. It was undisputed that the R–236 met or exceeded all applicable government regulations and private standards. After hearing this testimony, the trial court found that the presence of the void bilge space and drain did not make the boat defective, terming the bilge drain a "common and practical" feature. The court also found that the absence of a device to warn of water in the bilge did not make the boat defective. Summing up, the court stated: "[T]he expert evidence and performance of the boat shows that it is superior to many similar products." Plaintiffs contend that these findings of fact are clearly erroneous.

■ In viewing the trial court's finding of fact under the "clearly erroneous" standard mandated by Fed.R.Civ.P. 52, we must accord due deference to the opportunity to the trial court to hear the witnesses and to judge their credibility. *Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 974–76 (5th Cir.1978) (reviewing trial court's evaluation of expert testimony under the clearly erroneous standards). "It is not our duty or right on appeal to sift through the evidence and determine whether we would have drawn the same inferences as the trier of fact and would have resolved credibility determinations in a like fashion." *Id.* at 976.

■ From its review of the expert testimony presented, and after observing the witnesses and making determinations as to their credibility, the trial court concluded that defendant's experts were correct in their contention that the R–236 was not "unreasonably dangerous" in its design or manufacture. Our review of the record does not leave us with "the definite and firm conviction that a mistake has been

---

**12.** Even if the plaintiffs were not aware of the boating maxim: "If the boat capsizes, stay with the boat," the Texas Skipper's Course, furnished to Pavlides by the salesman, gives this instruction (in italics) under "Emergency Procedures."

committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We affirm the trial court's ruling that the R–236 was not defective in design or manufacture, turning now to the issue of failure to warn.

### · *Failure to Warn: Standard of Adequate Warning*

██ Strict liability for failure-to-warn is founded on twin principles of social utility and the right of the individual to determine his own fate. On the one hand, the manufacturer's duty to instruct and warn as to all hazards which as an expert he could foresee is derived from the notion that a warning that costs the manufacturer little can prevent severe losses by enabling users to avert harm. *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1274–75 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). But also, the user has an individual right to this knowledge. As we stated in a leading products liability case: "Any . . . product user has a right to decide whether to expose himself to the risk." *Borel,* 493 F.2d at 1106. Strict liability, including failure to warn, is available in actions brought under the Death on the High Seas Act ("DOHSA"), *Soileau v. Nicklos Drilling Co.,* 302 F.Supp. 119 (W.D.La. 1969).

██ It is a fundamental principle of the law of product liability in this Circuit that a manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold. *Borel,* 493 F.2d at 1088–90; *see* Restatement (Second) of Torts, Section 402 A. comment j. In assessing what hazards are foreseeable, a manufacturer is held to the status of an expert. *Borel,* 493 F.2d at 1089. The lack of adequate warnings renders a product defective and unreasonably dangerous [13] even if there

is no manufacturing or design defect in the product. *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 465–66 (5th Cir.1976); *Reyes,* 498 F.2d at 1272–73.

██ We have repeatedly held that in order for a warning to be adequate, it must provide "a complete disclosure of the existence and extent of the risk involved," *Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.,* 437 F.2d 1295, 1303 (5th Cir.1971) (warning that product be administered only to "healthy hogs" insufficient warning of danger that hogs would catch cholera from cholera vaccine). A warning must (1) be designed so it can reasonably be expected to catch the attention of the consumer; (2) be comprehensible and give a fair indication of the specific risks involved with the product; and (3) be of an intensity justified by the magnitude of the risk. *Bituminous Casualty Corp. v. Black & Decker Manufacturing Co.,* 518 S.W.2d 868, 872–73 (Tex.Civ.App.—Dallas, 1974), writ ref'd n.r.e.[14]

> The question of whether or not a given warning is legally sufficient depends upon the language used and the impression that such language is calculated to make upon the mind of the *average user of the product.*

*Id.* at 873 (emphasis added).

██ Since the warning is intended to be adequate for the "average user" of the product, the adequacy of the warning must be evaluated together with the knowledge of the ultimate users of the product. Where, for example, a product is marketed solely to professionals experienced in using the product, the manufacturer may rely on the knowledge which a reasonable professional would apply in using the product. *See Martinez,* 529 F.2d at 465–67 (where product was marketed exclusively for use by experienced professionals, industrial manufacturer could tailor its warnings accordingly). Where, however, the product is

---

**13.** This circuit follows the Restatement which treats the two terms as synonymous. *Burks v. Firestone Tire and Rubber Co.,* 633 F.2d 1152, 1154 n. 3 (5th Cir.1981).

**14.** The general maritime law of this Circuit applies the same rule as is applied in Texas courts. *Harrison,* 577 F.2d 968, 977 and n. 12.

marketed to the general public, the manufacturer must tailor the warning to the man-in-the-street, *Borel,* 493 F.2d at 1092–93 (dangers of asbestos dust not well enough known to insulation workers to reduce manufacturer's duty to warn). Thus, contrary to the trial court's view, a manufacturer does *not* generally have the right to assume that persons using a complex product know how it is to be used.

In concluding as a matter of law that a manufacturer could make such an assumption in general, and in applying that assumption to the instant case, the trial court erred.[15] The evidence clearly showed that the R–236 was marketed to the general public; no restrictions were imposed on its sale by AMF. Therefore, AMF had the duty to provide a warning that gave consumers with no special knowledge of how to operate the R–236 adequate information about all particular and nonobvious hazards associated with its operation.

 The trial court's finding that "any reasonably prudent boater must have known that it was unsafe to operate the boat with a bilge space open to ocean water" betrays a second, related misconception as to the standard of adequacy: a warning must advise the user of the *specific* nature and extent of the risk involved. *Borel,* 493 F.2d at 1104–05 (on petition for rehearing en banc) (general warnings to avoid breathing asbestos dust because inhalation "may be harmful" did not adequately warn workers of the damage of contacting asbestosis, mesothelioma and other asbestos-caused cancers). The danger involved with the R–236 was not so much that it was unsafe to leave the bilge drain unplugged as that the accidental slipping out of the plug could set in motion a catastrophic sequence of events which if not arrested immediately would inevitably result in the boat's submerging. An ordinary consumer could not be expected to infer that this sequence of events would occur even if he did realize that the bilge drain should be plugged.[16]

 AMF, on the other hand, should have foreseen this danger and warned of it. The depositions of AMF's experts and their testimony at trial established that AMF knew or should have known that it was possible for bilge plugs to come out at sea, and that if this happened in the R–236 the occupants of the boat might not realize that the bilge was flooding until a substantial amount of water entered the bilge, since the boat was not equipped with a warning device or an automatic bilge pump. AMF knew that loss of the bilge drain plug at sea presented a "severe hazard." More specifically, AMF knew, or should have known, that if the bilge filled with water the battery box would flood, causing the bilge pump to fail. AMF also knew that the R–236 was not self-bailing as the other Robalos were, and that consequently it could swamp. Finally, AMF knew, or should have known, that if the boat swamped sufficiently the water would reach the air intakes and shut off the engines. Holding AMF to the legally mandated standard of expertness, we find that the manufacturer should reasonably have foreseen that a disaster like that which happened here could occur if warnings adequate to inform an ordinary person of the specific danger were not given. Consequently, it had a commensurate duty to provide such a warning.[17]

---

**15.** The case on which the trial court relied for this legal conclusion, Chistofferson v. Halliburton Company, 1977 A.M.C. 2505, 2516 (W.D. La.1977), was, like *Martinez,* a "professional user" case.

**16.** Where, as here, a finding of fact is based on a misconception of the underlying legal standard, an appellate court is not bound by the clearly erroneous standard of review. *Noritake Co., Inc. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 727–28 (5th Cir.1980). However, we need not determine whether this finding of fact is error since it is irrelevant to the determination of whether AMF should be liable for failure to warn.

**17.** Plaintiffs also argue that the trial court was clearly erroneous in finding that AMF did not have a duty to test the product so as to discover the boat's alleged tendency to capsize as it did in the plaintiffs' test. We need not reach this issue, since the trial court's unchallenged finding that the R–236 was not capsizing when

*Actual Knowledge is an Affirmative Defense*

■ Not only did the trial court apply an incorrect standard of adequacy in evaluating the warning in this case, but it also imposed an unduly heavy burden of proof on the plaintiff by construing what is properly an affirmative defense—the plaintiff's "actual knowledge" of the specific hazard—as an element on which the plaintiff bore the burden of proof.

Where a plaintiff has made out a prima facie case of "failure to warn" of a hazard, the manufacturer may assert as an affirmative defense that the user already had actual knowledge of that specific risk. The burden is on the defendant to show that the user had knowledge of the specific hazard and of the extent of harm that could follow, so that his choice to brave it was an informed one. *Maxey v. Freightliner Corp.,* 450 F.Supp. 955, 960 (N.D.Tex.1978), *aff'd in pertinent part,* 665 F.2d 1367 (5th Cir. 1982) (en banc).

■ In determining that plaintiffs had not proved that AMF failed to warn or instruct, the trial court erroneously considered the representation allegedly made to Sam Pavlides by the salesmen as part of the warning given by AMF which plaintiffs had to prove inadequate. This is incorrect as a matter of law: where the manufacturer's own warnings are inadequate, representations made by third parties [18] are to be considered only as going to the actual knowledge of the user. In requiring plaintiffs to show the inadequacy of the salesmen's representations, the trial court misapplied the burden of proof in failure-to-warn actions. If plaintiffs showed that AMF itself did not provide adequate warning, the burden shifted to AMF to show, as an affirmative defense, that the salesmen's representations gave Pavlides actual—adequate and specific—knowledge of the hazards associated with the void bilge space and drain.

■ In the instant case, application of the correct standard of adequacy and the correct burden of proof to this record shows that plaintiffs met their initial burden of proof. The information provided by AMF on the R–236—the Owner's Manual and the sales pamphlet containing the specifications—does not mention the void bilge of the R–236, the bilge drain or the hazards of bilge flooding. Therefore, under the standard of *Borel* and cases following it, this material provides a legally insufficient warning to the average Robalo buyer of the potential dangers associated with use of the R–236.

It would be unfair to the parties for us to attempt to determine from this record whether the defendants proved that Pavlides or others had actual knowledge of the specific risks and of the extent of the harm that might be suffered should the bilge drain plug accidentally fall out. Since the trial court applied an erroneous standard of adequacy of warning and erroneous burdens of proof, the defendants were not called upon to meet the correct test at trial. They must be given a chance to do so. Therefore, we remand for further proceedings on the issue of actual knowledge and related questions.

■ If defendants fail to show actual knowledge, the trial court must then consider whether AMF's failure to warn was a producing cause of the accident,[19] as it is legally presumed to be. Where inadequate warnings are provided, the law presumes that a user would have read warnings provided and acted to minimize the risk to himself. *Reyes,* 498 F.2d at 1287. In the absence of evidence to the contrary, therefore, the manufacturer's failure to warn is held to be a producing cause of the

---

the men abandoned the boat means that AMF's failure to test and warn of this hazard could not have been a producing cause of the accident.

18. The salesmen were not employees of AMF, but of Redwing Boat Company.

19. In light of our ruling that AMF's instructions were deficient, the trial court's finding that the plaintiffs died "because they failed to follow instructions" must, of course, also be reconsidered if plaintiffs had no "actual knowledge."

accident. *Id.* at 1281–82.[20] Finally, if the trial court should find AMF strictly liable for failure to warn, it must then consider whether there was contributory fault on plaintiffs' part.[21] DOHSA specifically states that any contributory negligence of the deceased shall not bar recovery but shall be taken into account in determining damages. 46 U.S.C. § 766. *See also Lewis v. Timco,* 716 F.2d 1425 (5th Cir.1983) (en banc) (comparative fault held to apply generally to strict liability actions under federal maritime jurisdiction).

The judgment below is reversed and the case is remanded for further proceedings in accordance with this opinion.

REVERSED and REMANDED.

APPENDIX

**20.** In the instant case, a conclusion that AMF failed adequately to warn plaintiffs of the dangers of the R–236 design would give rise to a presumption that had an adequate warning been provided, they would have acted so as to minimize the risk. Had Pavlides been adequately warned, he might not have bought an R–236 at all, or he might have installed a warning device or automatic bilge pump to avert the danger of water accumulating in the bilge unbeknownst to the occupants of the boat.

**21.** In evaluating the reasonableness of the actions of a plaintiff in an emergency not caused by the plaintiffs' negligence, the emergency nature of the situation must be considered; *see* W. Prosser, *Handbook of the Law of Torts,* at 168–70 (1971). Thus, if AMF's failure to warn was the producing cause of the boat submerging in icy water, the court should evaluate the reasonableness of the plaintiffs' actions in light of their emergency situation.