**In re: M/V DANIELLE BOUCHARD**

**No. CIV. A. 98–485, CIV. A. 98–923, CIV. A. 00–692.**

United States District Court, E.D. Louisiana.

April 2, 2001.

ute. Again, actions comporting with the fed-

eral law provide only a potential defense.

George Moore Gilly, William Joseph Riviere, Phelps Dunbar, LLP, New Orleans, LA, for Danielle M. Bouchard Corp., Brouchard Coastwise Management Corp.

David S. Bland, James W. Noe, King, LeBlanc & Bland, LLP, New Orleans, LA, Jon Daniel Picou, Larzelere, Picou & Wells, LLC, Peter L. Hilbert, Jr., Darnell Bludworth, Dorothy S.W. Lawrence, Sher Garner Cahill Richter Klein McAlister &

Hilbert, LLC, New Orleans, LA, for Gretna Machine & Iron Works Inc.

George Moore Gilly, William Joseph Riviere, Phelps Dunbar, LLP, New Orleans, LA, Andrew C. Wilson, Burke & Mayer, New Orleans, LA, Peter L. Hilbert, Jr., Darnell Bludworth, New Orleans, LA, for Oryx Energy Co., Anadarko Petroleum Corp., Burlington Resources Offshore Inc., C.M.S. Nomeco Oil & Gas Co. and Marathon Pipe Line Co.

John Donellan Fitzmorris, Jr., Francis A. Courtenay, Jr., Donald J. Volpi, Jr., Courtenay, Forstall, Hunter & Fontana, New Orleans, LA, Philip S. Brooks, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Netec Inc.

## ORDER AND REASONS

VANCE, District Judge.

Before the Court is a motion for summary judgment by defendant Washington Chain and Supply, Inc. For the following reasons, the Court grants defendant's motion.

### I. Background

Defendant Washington Chain and Supply, Inc. sells Ulster-type chain stoppers, which consist of a cast steel base with a groove down its center (through which the chain passes) and one moving part—an arm or pawl. The pawl is hinged to the top of the base, enabling it to fall down into the groove and engage against the upper portion of a vertically aligned chain link, thereby stopping the chain.

Washington Chain sold the chain stopper at issue to Dreyfus Supply, Inc. in March 1997. Dreyfus, in turn, sold the chain stopper to plaintiff Gretna Machine and Iron Works, a shipbuilder. Gretna Machine installed the chain stopper aboard Bouchard Barge B–245 as part of the barge's anchoring system, but it mounted the chain stopper too low and out of proper alignment with the other anchor-handling gear. As a result of this improper alignment, the anchor chain did not pass through the chain stopper with each link of the chain alternatively vertical and horizontal. Instead, the anchor chain passed through at an angle of approximately forty-five degrees, which precluded the pawl from engaging the chain properly and stopping the anchor chain.

Plaintiff Bouchard Coastwise Management Corporation took delivery of Barge B–245 on May 21, 1997. Shortly after delivery, it became apparent that the anchor was slipping despite the windlass band brake, the clutch, and the chain stopper. When the anchor slipped, only the safety chain apparently restrained it from dropping to the ocean floor.

On December 11, 1997, the safety pin used to attach the safety chain to the anchor chain was bent when a representative of NETEC, Inc. released the anchor brake and allowed the anchor to drop on its own weight for a distance of about five feet until the safety chain stopped it. When Captain Brooks Kemmer assumed command of the M/V DANIELLE BOUCHARD on December 22, 1997, he knew that the barge anchor was slipping, that the only functional anchor restraint was the safety chain, that the safety pin was bent, and that the safety chain could not be used without a replacement pin. Nevertheless, on December 23, 1997, Captain Kemmer ordered the tug and tow to sea without having obtained a replacement pin for the safety chain. During the transit from Lake Charles, Louisiana to Port Everglades, Florida the barge apparently dragged its anchor, damaging two undersea pipelines and related equipment. As a result of this damage, there was a flurry of lawsuits. Plaintiffs settled various oil com-

panies' claims and seek to recover against Washington Chain and NETEC, Inc., the designer and manufacturer of the anchor windlass.

Washington Chain now moves for summary judgment. It argues that there is no prima facie evidence that the chain stopper was defectively designed, that it had no duty to instruct Gretna Machine how to install the chain stopper, and that Captain Kemmer's negligence was the superseding cause of plaintiff's damages. Plaintiffs oppose the motion.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Accordingly, a court must be satisfied that no reasonable trier of fact could find for the nonmoving party. In other words, "if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir.2000).

Initially, the moving party bears the burden of establishing that there are no genuine issues of material fact. If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing

that a genuine issue exists. *See id.* at 324, 106 S.Ct. at 2553. *See also Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential on which it bears the burden of proof at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325, 106 S.Ct. at 2553–54; *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir.1999).

The Fifth Circuit has "arguably articulated an even more lenient standard for summary judgment in certain nonjury cases." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 273 n. 15 (5th Cir.1987). In *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123 (5th Cir.1978), the Fifth Circuit explained:

There is no litmus test that infallibly distinguishes those issues that are 'factual' from those that are 'legal' or 'mixed.' ... as we approach the point where facts and the application of legal rule to them blend, appraising evidentiary facts in terms of their legal consequences and 'applying' law to fact become inseparable processes.

Therefore, in a nonjury case, such as this one, the Court is encouraged to draw inferences, even when they appear to be factual, if a "trial on the merits would reveal no additional data." *Id.* at 1124.

### B. Washington Chain's Fault

In *East River Steamship Corp. v. Transamerica Delaval, Inc.*, the United States Supreme Court recognized that the law of products liability is a part of general maritime law. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865

(1986). As general maritime law is "an amalgam of traditional common law rules, modifications of those rules, and newly created rules," courts have consulted state law and the Restatement (Second) of Torts for the applicable substantive law of products liability. *Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 538 (5th Cir.1987) (quoting *East River S.S. Corp.*, 476 U.S. at 865, 106 S.Ct. at 2299). Section 402A of the Restatement (Second) of Torts requires a plaintiff to prove: "(1) that the defendant sold or manufactured the product; (2) that the product was unreasonably dangerous or was in a defective condition when it left the defendant's control; and (3) that the defect resulted in injury to the plaintiff." 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5–6 (3d ed.2001). *See also Vickers*, 822 F.2d at 538 (citing RESTATEMENT (SECOND) OF TORTS § 402A).

 In order to recover from Washington Chain, plaintiffs must show that the chain stopper was defective and unreasonably dangerous for its "normal" use. *See Vickers*, 822 F.2d at 538 (citing RESTATEMENT (SECOND) OF TORTS § 402A cmt. h). "Normal" use includes all reasonably foreseeable uses, including foreseeable misuse. *See id.* (citing *LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985, 989 (5th Cir. 1980) (applying Louisiana law)). A product can be considered unreasonably dangerous if it is defective in design or manufacture or if it is defective because of inadequate instructions or warnings. *See Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 337–39 (5th Cir.1984). Here, plaintiffs claim that the chain stopper was defective in design and that Washington Chain failed to provide instructions how to install the chain stopper properly.

### 1. Design Defect

 Washington Chain argues that defendants have failed to present a prima facie case of defective design. It asserts that while both of plaintiffs' experts criticize the chain stopper design, they do so in a conclusory fashion, devoid of the specific facts necessary to establish a prima facie case.

#### a. Ian Cairns

Washington Chain' first challenges the expert report of Ian Cairns. Mr. Cairns does not have an engineering degree and "wouldn't presume to engineer [a chain stopper] from scratch," but considers himself an expert in the *use* of the Ulster-type chain stopper. (Pls.' Supplemental Mem. Opp'n Def.'s Mot. Summ. J., Ex. A at 5, 11.) Based on that expertise, Mr. Cairns opines in his report:

> The [chain] stopper did not work because it was installed misaligned, thus allowing the anchor chain to pass over the stopper bed at an angle of about [forty-five degrees] and therefore the pawl did not engage the chain properly. A properly installed stopper allows the chain to pass through it with each link of the chain alternatively vertical or horizontal. This stopper had a very short bedplate with shallow grooves that did not provide for any self-aligning characteristics.

(Def.'s Mem. Supp. Mot. Summ. J., Ex. C at 12.) As Mr. Cairns states, the chain stopper did not work *because* it was improperly installed. He then criticizes the length of the bedplate and the depth of the groove. Mr. Cairns' report, however, does *not* state that the latter deficiencies rendered the chain stopper design defective. He merely concludes that the lack of a working stopper contributed to the alleged incident. He does not opine that a longer bedplate or a deeper groove would have been necessary even if Gretna Machine had not installed the equipment out of alignment. The Court accordingly rejects

any suggestion in Mr. Cairns' report that the chain stopper was defectively designed as a naked conclusion. *See Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 331 (5th Cir.1998) ("For the purposes of summary judgment under [Federal Rule of Civil Procedure] 56(e), an expert affidavit must include materials on which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion."). *See also Weigel v. Target Stores,* 122 F.3d 461, 469 (7th Cir.1997) ("naked conclusion is wholly uninformative and entitled to no weight").

At his deposition, Mr. Cairns testified that when he inspected the chain stopper in St. Croix, U.S. Virgin Islands, he saw that "the depth of the groove wasn't sufficient to allow the flat of the horizontal wings to ride upon the bed plate." (Pls.' Supplemental Mem. Opp'n Def.'s Mot. Summ. J., Ex. A at 29.) Notwithstanding this visual observation, Mr. Cairns does *not* testify that the design depth of the groove precluded a properly installed chain stopper from stopping the anchor chain. Indeed, when asked whether the chain stopper would have worked if it had been installed properly, he replied: "Most likely, yes. But obviously I can't know that without having seen it installed properly." (*Id.,* Ex. A at 47.) Furthermore, while a longer bedplate and deeper groove *may* have improved the self-aligning characteristics of the chain stopper, Mr. Cairns neither took any measurements nor performed any tests to confirm that the chain stopper, as designed, would not stop the anchor chain, if properly installed. (*Id.,* Ex. A at 15, 19, 21, 28–29.) Therefore, the Court finds that his testimony does not support plaintiffs' contention that the chain stopper design is defective.

### b. Stephen Killingsworth

Washington Chain also challenges the expert report of Stephen Killingsworth, who is a mechanical engineer familiar with chain stoppers. (*Id.,* Ex. B at 6–7.) In his report Mr. Killingsworth states:

> The chain stopper did not have the correct geometric configuration for the chain; specifically pocket depth for the chain used ... was too shallow. Since [Washington Chain] did not engineer the stopper but simply resized the stopper from another model stopper, dimensional and material errors were manufactured into the stopper. This would explain the fit of the chain in the stopper as well as the excessive wear of the chain stopper at the chain (flat link) contact point.

(Def.'s Mem. Supp. Mot. Summ. J., Ex. D at 7.) Although Mr. Killingsworth criticizes the shallow groove of the chain stopper design, he does *not* opine in his report that the shallow groove would prevent a properly installed chain stopper from stopping the anchor chain.

At his deposition, when asked whether the chain would have passed through the chain stopper with the correct alternating horizontal and vertical orientation to the links, if the chain stopper had been properly installed, Mr. Killingsworth testified:

> I won't say that they would have been perfectly vertical, there would have been some—there could have been some angular—it would depend upon the differential between the depth of the groove and where it entered into the hawsepipe. But it would be close. It would be close I'll admit.

(Pls.' Supplemental Mem. Opp'n Def.'s Mot. Summ. J., Ex. B at 29.) He further testified that if the chain stopper had been installed so that the chain would pass through it in something close to an alternating horizontal and vertical configuration, he could not say whether the chain stopper would have functioned properly or

improperly. (*Id.*, Ex. B at 31–32 ("I can't say either way, that's correct."), 52 (even if the groove were deeper).) While Mr. Killingsworth testifies that a deeper groove would have tolerated more misalignment, he does not testify that the shallower groove prevented a properly installed chain stopper from stopping the anchor chain. Indeed, when asked whether this chain stopper was capable of performing as designed, he answered: "Yes." (*Id.*, Ex. B at 32–33, 81.)

■ The Court further notes that plaintiffs' assertions that Washington Chain did nothing to determine the adequacy of the chain stopper design are irrelevant to a determination whether the design is *actually* defective. Therefore, as neither Mr. Cairns nor Mr. Killingsworth opines that the chain stopper, as designed, would not perform its function if installed properly, the Court grants Washington Chain's motion to dismiss plaintiffs' claims of defective design.

### 2. Instructions

■ Even if a product is not defectively designed, the lack of adequate warnings may render it defective and unreasonably dangerous. *See Pavlides,* 727 F.2d at 338. The adequacy of a warning is evaluated in light of the knowledge and expertise of the user of the product. *See Todd Shipyards Corp. v. Hercules, Inc.,* 859 F.2d 1224, 1225 (5th Cir.1988) (per curiam) ("A manufacturer's duty to warn is limited 'where the purchaser or the user has certain knowledge or sophistication, professionally or otherwise, in regard to the product." (quoting *American Mut. Liab. Ins. Co. v. Firestone & Rubber Co.,* 799 F.2d 993, 994 (5th Cir.1986))); *Koonce v. Quaker Safety Prods. & Mfg. Co.,* 798 F.2d 700, 716 (5th Cir.1986) ("The adequacy of the warning must be evaluated in connection with the knowledge and expertise of

the user of the product."). Under the Louisiana Products Liability Act, "a manufacturer is not required to provide an adequate warning about his product when ... the user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic." LA. REV. STAT. § 9:2800.57.

Here, the relevant user is Gretna Machine. Gretna Machine is a sophisticated user in the business of building and installing equipment aboard vessels such as Bouchard Barge B–245. It maintains an engineering department staffed with qualified engineers.

Although plaintiffs' experts (Mr. Cairns and Mr. Killingsworth) opine that Gretna Machine required installation instructions for the chain stopper, Manuel Guzman, Gretna Machine's chief engineer in charge of the design of Barge B–245, testified otherwise. (Pls.' Mem. Opp'n Def.'s Mot. Summ. J., Ex. C at 12, Ex. D at 7; Pls.' Supplemental Mem. Opp'n Def.'s Mot. Summ. J., Ex. A at 35–36, 39–40, 42–43, Ex. B at 16–20, 40–42, 54–56.) Specifically, Mr. Guzman testified that he felt comfortable, based on his experience as a ship designer, to position this chain stopper properly. (Def.'s Mem. Supp. Mot. Summ. J., Ex. C at 49.) He further testified that if he had any questions regarding the installation of the chain stopper, he would have resolved those issues in discussions with the engineers in his department. (*Id.*, Ex. C at 49–50.) No outside or additional assistance would have been necessary. (*Id.*, Ex. C at 50.) In determining whether Washington Chain had a duty to provide Gretna Machine with instructions how to install the chain stopper properly, it is Gretna Machine's knowledge and expertise that matters, not Mr. Cairns' or Mr. Killingsworth's opinions about what

*they* believe Gretna Machine required. Mr. Guzman was clear—he did *not* need any installation instructions from Washington Chain.

Furthermore, the Court finds that Mr. Cairns never establishes that Washington Chain had a duty to provide Gretna Machine any installation instructions. In his expert report, he merely offers a conclusory opinion that Gretna Machine required installation instructions, which the Court rejects as a naked conclusion. (Pls.' Mem. Opp'n Def.'s Mot. Summ. J., Ex. C at 12.) Moreover, his deposition testimony on this issue was evasive and unresponsive, and Mr. Cairns never opined that Washington Chain had a duty to provide Gretna Machine with these instructions. (Pls.' Supplemental Mem. Opp'n Def.'s Mot. Summ. J., Ex. A at 35–38.)

The Court also finds that although Mr. Killingsworth opines that shipbuilders in general need installation instructions, he does not know what process Gretna Machine went through to install this chain stopper. (*Id.,* Ex. B at 53–54.) As Mr. Guzman testified that Gretna Machine did not need any installation instructions, the Court rejects Mr. Killingsworth's general assertions. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 2597, 125 L.Ed.2d 168 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

The Court therefore finds that Washington Chain had no duty to instruct Gretna Machine how to install the chain stopper and dismisses plaintiffs' claim for Washington Chain's failure to provide installation instructions. Having dismissed plaintiffs' claims for defective design and failure to provide installation instructions, the Court finds it unnecessary to address the merits of Washington Chain's superseding cause argument.

## III. CONCLUSION

For the foregoing reasons, the Court grants Washington Chain's motion for summary judgment.