J.E. REHLER, Independent Executor of the Estate of James A. Rehler, Deceased, Plaintiff-Appellant,

v.

BEECH AIRCRAFT CORPORATION, Defendant-Appellee.

No. 84–1086.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1985.

Byrd, Davis & Eisenberg, Tom Davis, James H. Furman, Austin, Tex., for plaintiff-appellant.

Mayor, Day & Caldwell, Richard H. Caldwell, Mark R. Zeidman, Houston, Tex., for defendant-appellee.

Before RANDALL, JOHNSON, and GARWOOD, Circuit Judges.

**1074**

## OPINION

GARWOOD, Circuit Judge:

J.E. Rehler, plaintiff-appellant in this Texas diversity suit to recover for the wrongful death of James A. Rehler, appeals the district court's judgment on the jury's verdict in favor of the defendant-appellee, Beech Aircraft Corporation. Appellant asserts that the district court committed reversible error by refusing to submit certain requested issues and instructions to the jury, and that the jury finding of pilot negligence is not supported by sufficient evidence. Finding that the matters complained of do not present reversible error, we affirm.

### FACTS AND PROCEEDINGS BELOW

In this suit, J.E. Rehler, sought to recover for the wrongful death of his father, James A. Rehler ("Rehler"), who died when the Beech Baron, model 95–B55, aircraft he was piloting crashed outside Jarrell, Texas, on March 21, 1979. Rehler's Baron, a light, twin-engine airplane, was manufactured by defendant-appellee, Beech Aircraft Corporation, in 1974. The Federal Aviation Administration's ("FAA") aircraft registration file indicates that the aircraft was given an airworthiness certificate on July 7, 1974,[1] and was initially sold by Beech to Chaparral Aviation on July 18, 1974. The airplane subsequently was sold a number of times, and ultimately was purchased by the decedent[2] from Gantt Aviation in Georgetown, Texas, on August 25, 1978, approximately seven months before the accident.

Rehler departed from Georgetown Municipal Airport in his airplane on the afternoon of the fatal accident, March 21, 1979. Approximately one hour after Rehler took the Baron into the air, three bystanders observed that the plane was spinning to the left. One of the witnesses testified at trial that the airplane was at a low altitude prior to the spin, and further indicated in a statement to the National Transportation Safety Board ("NTSB"), subsequently admitted as an exhibit, that the airplane's "nose [was] pitched down." The Baron subsequently crashed, killing Rehler. The witnesses were unable to see the airplane hit the ground, since the site was obscured by trees; as a result, they were unable to testify whether the nose of the airplane faced up or down at the time of impact. The plane crashed nine miles north of its point of takeoff.

The NTSB, the federal agency responsible for investigating all fatal aircraft accidents in the United States, investigated Rehler's death. The parties stipulated that "[a]n examination of the aircraft by the NTSB following the accident failed to reveal any malfunctioning parts or any mechanical reason which would have precluded normal operation of the aircraft prior to impact." The parties also agreed that "[n]o turbulence was reported" on the afternoon of the accident and that Rehler had visability of twenty miles. Moreover, the parties stipulated that in an autopsy and toxicological study performed on the decedent, "[n]o evidence was found to indicate

---

1. Before a model of airplane may be sold to the public, the FAA must issue a "type certificate" which indicates that the model of aircraft "is of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the" FAA. 49 U.S.C. § 1423(a). The Beech Baron, model 95–B55, received a type certificate on September 9, 1963. The model was certified as a normal category airplane, which meant that acrobatic maneuvers, including spins, were prohibited. The aircraft accordingly contained a placard which stated, "This airplane must be operated as a normal category airplane in compliance with the operating limitations stated in the form of placards, markings and manuals. No acrobatic maneuvers, including spins, approved."

Before a specific airplane may be sold to the public, the FAA must also issue an "airworthiness certificate." This certificate indicates that the "aircraft conforms to the type certificate ... and ... that the aircraft is in condition for safe operation." 49 U.S.C. § 1423(c).

2. Rehler received his single-engine private pilot rating on December 9, 1974, and his first multi-engine rating, for center line thrust only, on August 8, 1975. He received a conventional twin-engine aircraft rating on September 16, 1976. He also received his instrument rating on January 22, 1979.

pilot incapacitation or impairment to operate an aircraft."

The plaintiff-appellant, J.E. Rehler, independent executor of the Estate of James A. Rehler, brought this wrongful death action on behalf of the decedent's estate and heirs. The case was tried to a jury. Under a products liability theory,[3] the plaintiff alleged that Beech was liable for defective design of the Baron and for failure to adequately warn consumers that the aircraft had a tendency to enter into a flat spin. Under a misrepresentation theory,[4] he alleged that Beech had falsely represented that the spin recovery procedure contained in the *Pilot's Operating Hand-* *book and FAA Approved Airplane Flight Manual* ("Pilot's Operating Handbook") would correct a flat spin, that the aircraft had been properly tested for undue spinning tendencies, and that the Baron did not have undue spinning tendencies.[5] In addition to compensatory damages he sought exemplary damages on the ground that the defendant had shown a conscious indifference to the safety of persons flying the Baron. The jury subsequently returned a special verdict finding that there was no defective design of the aircraft, nor any failure by Beech to give adequate warnings and instructions for its safe use, which was a producing cause of the accident, and that

---

**3.** Plaintiff brought his products liability claim under *Restatement (Second) of Torts,* section 402A, which provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

This section has been incorporated into Texas law. *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 375 (Tex.1978) ("The doctrine of strict liability as enunciated in the Restatement (second) of Torts § 402A has been adopted as the rule in Texas."); *Lubbock Mfg. Co. v. Sames,* 598 S.W.2d 234, 236 (Tex.1980) (same).

**4.** Rehler brought his claim for misrepresentation under *Restatement (Second) of Torts,* section 402B, which provides:

"Misrepresentation by Seller of Chattels to Consumer

"One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of

the chattel caused by justifiable reliance upon the misrepresentation, even though

"(a) it is not made fraudulently or negligently, and

"(b) the consumer has not brought the chattel from or entered into any contractual relation with the seller."

This section has been adopted by Texas courts. *See* note 8, *infra.*

**5.** Specifically, the executor alleged that Beech failed to take accepted design criteria concerning spin characteristics and recovery procedures into account in the design of the Baron; that it failed to spin test the model and consequently failed to gather adequate information concerning the airplane's spin and recovery characteristics; that it designed the Baron in such a way that it could fall into an unrecoverable spin mode; that it failed to put any warning in the Baron's Pilot's Operating Handbook to the effect that the airplane had a tendency to fall into a spin; that the spin recovery procedure it placed in that manual would be ineffective if the airplane actually entered a spin, and that it failed to warn as to the ineffectiveness of the recovery procedure; that it falsely represented that the Baron had been properly tested and had no undue spinning tendencies; that it did not put any single-engine stall speeds in the manual; and that after it knew that the Baron would enter a flat spin and that the recovery procedure outlined in the manual would be ineffective, it failed to test to determine the extent of those characteristics, failed to modify or decrease the airplane's flat spin characteristics or undue spinning tendencies, failed to warn that the airplane had a tendency to enter a flat spin and that such a flat spin was usually unrecoverable, failed to warn that the procedure in the manual was ineffective, and failed to issue any instructions concerning recovery from a flat spin.

Plaintiff argued that each of these acts or omissions was a proximate cause of the accident.

pilot negligence was a producing cause of the accident, accounting for 100 percent of the causation.[6] The district court entered judgment for Beech on the jury verdict.

## DISCUSSION

On appeal, J.E. Rehler argues that the district court erred by refusing to submit to the jury issues concerning whether Beech made misrepresentations respecting its testing of the Baron's undue spinning tendencies, the presence of undue spinning tendencies, the effectiveness of the spin recovery procedure outlined in its Pilot's Operating Handbook, and whether Beech had shown conscious indifference to the safety of those who would fly in the Baron model. Appellant also argues that the district court erred by refusing to give certain requested instructions which appellant contends were necessary for the jury to adequately understand the issues. Appellant's final contention respecting liability is that the evidence is insufficient to support the jury's finding of pilot negligence. We address these asserted grounds for reversal in turn.

### Pilot's Operating Handbook

█ Appellant argues that the district court erred by refusing to submit to the jury the issue whether Beech misrepresented to Rehler that the spin recovery procedure outlined in the Pilot's Operating Handbook would bring the airplane out of "any" spin the airplane might enter into, when in fact the procedure would not cor-

rect a flat spin. He argues that this alleged misrepresentation is actionable under section 402B of the *Restatement (Second) of Torts.* In response, Beech argues, *inter alia,* that the district court *did* submit this issue to the jury. We agree with appellee that the district court's charge and the form of the first interrogatory encompass Rehler's misrepresentation theory as it pertains to any representation in the Pilot's Operating Handbook.

The Pilot's Operating Handbook for the Beech Baron stated:

"SPINS

"*If a spin is entered inadvertently:*

"Immediately move the control column full forward, apply full rudder opposite to the direction of the spin and reduce power on both engines to idle. These three actions should be done as near simultaneously as possible; then continue to hold this control position until rotation stops and then neutralize all controls and execute a smooth pullout. Ailerons should be neutral during recovery.

"NOTE

"Federal Aviation Administration Regulations did not require spin demonstration of airplanes of this weight; therefore, no spin tests have been conducted. The recovery technique is based on the best available information." [7]

---

6. The jury responded to the first special interrogatory as follows:

    "Which of the following, if any, do you find from a preponderance of the evidence was a producing cause of the accident in question, and what percentage of the total causation was attributable to each?

    "ANSWER 'We Do' and the percentage, or 'We do not' as to each. Your percentage must total 100%.

    "a) Defective design of the aircraft.
    "____We do not____ 0% .
    "b) Failure of Beech to give adequate warnings and instructions for the safe use of the aircraft.
    "____We do not____ 0% .
    "c) Pilot negligence.
    "____We Do____ · 100% ."

---

7. The above passage was the only information appearing on this page of the Pilot's Operating Handbook. The size and style of the typeface used in the spin recovery procedure section and in the text of the "NOTE" portion were identical.

Appellant argues that the manual failed to distinguish between flat spins and steep (normal) spins, since the manual obliquely states that the procedure is applicable "[i]f *a* spin is entered." He argues that while the procedure might effect a recovery from a steep or normal spin, the procedure has been shown to be ineffective in correcting a flat spin. By suggesting falsely that the procedure will correct "any" spin, Rehler argues, the passage in Beech's manual constituted a misrepresentation actionable under section 402B.

Our understanding is that the Texas law of section 402B covers only affirmative or express misrepresentations.[8] Even if Texas courts were to extend section 402B's coverage to *implied* misrepresentations, however, we find that the charge and the form of the interrogatory were sufficient to cover any express *or* implied misrepresentations in this respect that might reasonably have been found in the Pilot's Operating Handbook. The first interrogatory which the district court submitted to the jury asked, "Which of the following [factors], if any, do you find from a preponderance of the evidence was a producing cause of the accident in question, and what percentage of the total causation was attributable to each?" Among the factors listed was the "[f]ailure of Beech to give adequate warnings and instructions for the safe use of the aircraft." The district court provided the following definition to the jurors:

" 'Adequate warnings and instructions' means warnings and instructions sufficient to convey to the reasonably prudent pilot the nature and extent of the dangers involved in the use of the aircraft and how to avoid the dangers."

We find that the interrogatory and charge were phrased in such a way that if the jury believed that the Pilot's Operating Handbook contained an express or implied false representation to the effect that the spin recovery procedure would correct a flat spin, the jury would have had to conclude that Beech had failed to give "adequate ... instructions" and warnings. The jury could not find that a spin recovery procedure which does not work and which, when followed, resulted in "physical harm to ... consumer[s]" constituted an "adequate" instruction. Conversely, in order for the jurors to have decided that the instructions in the manual were adequate, it seems clear that they would have had to conclude that the manual's spin recovery instructions did not contain "a misrepresentation of a *material* fact concerning the character" of the airplane which resulted in "physical harm to a consumer" because of his reliance on that misrepresentation. *Restatement (Second) of Torts* § 402B (emphasis added); *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429, 431 (Tex.1974) (Reavley, J.) (quoting section 402B in context of Texas law). However the jury answered the first interrogatory, it would by necessity also answer the question whether or not the Pilot's Operating Handbook contained an express or implied misrepresentation. Therefore, we find that the district court adequately submitted the issue of misrepresentation in the Pilot's Operating Handbook in the first special interrogatory.

---

**8.** The Supreme Court of Texas has incorporated section 402B into the state's substantive law. *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429, 431 (Tex.1974) (Reavley, J.). As courts have applied the Texas law, however, the section covers only affirmative or express misrepresentations. *See Crocker*, 514 S.W.2d at 433 ("[W]hen the drug company *positively and specifically* represents its product to be free and safe from all dangers of addiction, and when the treating physician relies upon that representation, the drug company is liable when the representation proves to be false and harm results." (Emphasis added.)); *Franks v. National Dairy Prods. Corp.*, 282 F.Supp. 528, 533 (W.D.Tex.1968), *aff'd*, 414 F.2d 682 (5th Cir.1969) (The language of section 402B and its comments "directs our attention to what we normally denominate as express representations, either oral or written. While the illustrations in the section were certainly not intended to be exhaustive, nevertheless, they speak only in terms of express representations."); *Bristol-Myers Co. v. Gonzales*, 548 S.W.2d 416, 425 (Ct.Civ.App.—Corpus Christi 1976), *rev'd on other grounds*, 561 S.W.2d 801 (Tex.1978) (testimony indicated that statement amounted to a "positive assertion" and an "affirmative representation" concerning the safety of a product, which representation was "defective, misleading and false").

Since the district court's first interrogatory covered appellant's section 402B misrepresentation theory, as it pertains to the Pilot's Operating Handbook, we reject appellant's argument that the district court erred by failing to submit the issue to the jury. *See Fleming v. Michigan Mut. Liab. Co.*, 363 F.2d 186, 189 (5th Cir.1966) ("It is a fundamental rule that a trial court is not required to give every charge requested or to instruct the jury in the particular manner or form requested by the parties, even though such instructions state correct principles of law, *if the subject matter of such requested special instructions was sufficiently covered by other instructions from the court.*" (Emphasis added.)); *Hussein v. Isthmian Lines, Inc.*, 405 F.2d 946, 949 (5th Cir.1968) (noting that trial court correctly declined requested instruction where the "substance of the requested instruction was covered in the judge's charge"); *Freimanis v. Sea Land Serv., Inc.*, 654 F.2d 1155, 1163 (5th Cir.1981) (" 'if the requested instruction is given "in substance," there is no error.' " (quoting *Beard v. Mitchell*, 604 F.2d 485, 497 (2d Cir.1979)). The jury's finding that no failure of Beech to give adequate warnings and instructions for the safe use of the airplane contributed to the accident has resolved that misrepresentation issue against appellant.[9]

### Undue Spinning Tendencies

Prior to the type certification of the Baron model in 1963, Beech performed a test flight in the aircraft. Among the characteristics Beech tested for was undue spinning tendencies, as required by Civil Air Regulation 3.123.[10] The Beech engineering test pilots, following the specific procedure outlined in that regulation, determined that the Baron satisfied the Civil Air Regulations. Beech transmitted test results on this and other characteristics to the FAA, which subsequently type certified the model.

At trial, appellant introduced evidence which suggested that the Baron demonstrated undue spinning tendencies following a single-engine stall. Appellant argues that the jury could have concluded from this evidence that Beech was intentionally deceptive in its test flights and

---

9. Beech argues that the manual contained no representation, either express or implied, to the effect that the spin recovery procedure would correct a flat spin. Beech points out that the "NOTE," which appeared on the same page of the handbook as the spin recovery procedure, negated any suggestion that Beech was representing that the procedure would correct "any" spin. Rather, Beech argues the note indicated that Beech had not conducted any spin tests whatever and had no firsthand knowledge of what techniques would be best suited for a flat spin. However, since we find that the district court submitted the misrepresentation theory to the jury and since that issue was resolved against appellant, we do not find it necessary to consider whether plaintiff had presented substantial evidence showing that the Pilot's Operating Handbook contained an express or implied misrepresentation.

10. Counsel for both parties signed a Pre-Trial Order which specified:

"The following facts and issues not in genuine dispute are established by the pleadings or are established by the stipulation or admissions of counsel:

" . . . .

"(e) Government regulations recognize that multiengine aircraft have a tendency to spin when stalled with one engine inoperative and the other producing power. The regulations, therefore, require that all civilian multiengine aircraft be tested to determine that they do not display any undue spinning tendency before they can be certificated. Civil Air Regulation CAR 3.123 states:

"3.123 *One-engine inoperative stalls.* Multiengine airplanes shall not display any undue spinning tendency and shall be safely recoverable without applying power to the inoperative engine when stalled with:

"(a) The critical engine inoperative,

"(b) Flaps and landing gear retracted,

"(c) The remaining engines operating at up to 75 percent of maximum continuous power, except that the power need not be greater than that at which the use of maximum control travel just holds the wings laterally level in approaching the stall. The operating engines may be throttled back during the recovery from the stall.

"The Baron Model 55 was flight tested by Beech engineering test pilots and found to be in compliance with this regulation.

"(f) Pursuant to FAA Regulations, the 95–B55 aircraft was certified as a normal category airplane."

certification of the Baron. Therefore, J.E. Rehler argues that the district court erred by refusing to submit to the jury the issues whether Beech misrepresented to the FAA (and consequently to the public) that the aircraft had been properly tested for undue spinning tendencies, when in fact it had not, and that the aircraft did not have an undue tendency to spin, when it actually did display such a tendency. *Restatement (Second) of Torts* § 402B. Finding no substantial evidence to indicate that Beech misrepresented anything concerning the Baron's alleged undue spinning tendencies or its testing of this supposed characteristic, we affirm the district court.

Appellant introduced into evidence a report compiled by United States Army Test Pilot Major Horton and Army Flight Test Engineer Paul Bonin. These two were commissioned by the Army in 1973 to test the Army version of the Baron. The report disclosed the results of these tests, particularly as to the Baron's single-engine characteristics. Bonin testified that prior to their test flights, he and Major Horton "determined the test conditions that [they] ... would test, the test procedure." William P. Kelly, an expert witness for *appellant,* testified that Horton and Bonin's "methods probably went—and *I am sure it went—beyond what is called for in the*

*FAA certification."* (Emphasis added.) The Army test flights were filmed by a chase plane. Based on characteristics the Baron displayed during these tests, Horton and Bonin compiled a report which suggested that the Baron had undue spinning tendencies.

Appellant's argument is that the jury could conclude from the "Horton" report and the chase pilot film that Beech had intentionally misreported the results of its single-engine stall test or otherwise deceived the FAA and consequently the public.[11] Phrased in terms of section 402B, appellant alleges that Beech had represented that FAA type certification had been achieved by following the normal and proper certification procedures when in fact it had been achieved by falsifying the test results. While appellant's evidence provided a basis from which the jury could have concluded that the tests required by the FAA in the Civil Air Regulations were not thorough enough to reveal the aircraft's undue spinning tendencies,[12] we find no substantial evidence to indicate that Beech failed to follow the FAA procedures or misreported the results of the Civil Air Regulations test.

As noted above, appellant's own expert, Kelly, stated that he was certain that the

11. We find no substantial evidence that Beech made any misrepresentation to the FAA. Even if Beech had made a misrepresentation, we are not convinced that a misrepresentation to the FAA is one *to Rehler,* as appellant argues. In Comment h to section 402B, the American Law Institute wrote:

> "h. 'To the public.' The rule stated in this Section is limited to misrepresentations which are made by the seller to the public *at large,* in order to induce purchase of the chattels sold, or are intended by the seller to, and do, *reach* the public. The form of the representation is not important. It may be made by public advertising in newspapers or television, by literature distributed to the public through dealers, by labels on the product sold, or leaflets accompanying it, or in any other manner, whether it be oral or written." (Emphasis added.)

Similarly, Comment j states that section 402B "does not apply where the misrepresentation is not known, or there is indifference to it, and it does not influence the purchase or subsequent

conduct." There is no evidence that Beech's representations, express or implied (*see* note 8, *supra* ), contained in Beech's communication of its test flight results to the FAA for type certification, ever "reach[ed]" the public at large or Rehler in particular. Moreover, section 402B limits *its* applicability to cases where there has been "justifiable reliance upon the misrepresentation." Since there is no evidence that any representations coming out of Beech's communication of the test flight results to the FAA ever reached Rehler, there of course is no evidence that he relied on those representations.

12. William Kelly, an expert testifying for appellant, stated, "For the certification, yes, you have to do it the way the regulation calls for and that is a rather mild test of an airplane, single engine stall." Kelly also stated that "the FAA certification tests for single engine stall isn't [*sic* ] very realistic. It is really a rather minor test that does not show the airplane at what might be its worse characteristics and such that say the general public might encounter."

Army tests went *beyond* the procedures required for type certification. Kelly added that the Army testers consequently would be expected to see a more severe reaction of the plane to a single-engine stall than would a pilot following the Civil Air Regulations procedure. Another one of appellant's own experts, Dr. Andrew Craig, affirmatively expressed the view that Beech had correctly followed the Civil Air Regulations and correctly reported the results of those tests. Craig responded to cross-examination:

"Q. [Y]ou are not saying that Beech's tests were misrepresented to the government in any way.

"A. That is correct.

" . . . .

"Q. Now, do you have any opinion that the Beech pilot, test pilot falsely reported the results of his tests?

"A. To the contrary.

"Q. You believe that he truly reported it.

"A. Yes.

"Q. And that in fact he got what he was supposed to get, isn't that correct, insofar as the FAA was concerned?

"A. Yes.

"Q. Now, that regulation with respect to the undue spinning tendency, that is the only place in the regulation that it appears, is in that one particular provision about the single engine operation, isn't that correct?

"A. Yes.

"Q. And it doesn't just say 'determined that there was no undue spinning tendency.'

"A. No.

"Q. It sets out some specific test parameters, is that correct?

"A. Yes.

"Q. You have no reason to believe that the Beech test pilot didn't follow those specific test parameters.

"A. That's right."

Dr. Craig went on to affirm that the Army testers did *not* "follow those specific test parameters" set out by the FAA and in fact *"far exceeded"* what the FAA requires to be done to determine if there is undue spinning tendencies." (Emphasis added.) Craig added that the Army's "intent was quite different from the certification flight test" and that that was the reason "why they got two different answers" to the question whether the Baron had undue spinning tendencies. Later during cross-examination, Craig acknowledged that subsequent to the type certification of the Baron, the FAA and Beech participated in a joint test program to "revalidate the findings of compliance with the Civil Air Regulations." Craig agreed

"that the FAA found the results were satisfactory, that it was concluded that *as required by the applicable regulations* no undue spinning tendency existed." (Emphasis added.) [13] We conclude that there is no substantial evidence supporting appellant's contention that Beech misrepresented that it had followed the procedure outlined in the Civil Air Regulations and had found no undue spinning tendencies during the course of that test. The fact that the Army, using an entirely different and more thorough and rigorous test regimen, discovered undue spinning tendencies, does not adequately support an inference that Beech failed to follow the FAA regulations or falsified the test results. Moreover, appellant's own expert opined that Beech *did* correctly follow the regulations and correct-

13. Appellant does not contend, nor do we find evidence indicating, that Beech represented that it did *more* than the FAA required in the way of single-engine stall testing. One of appellant's experts, William Kelly, testified that the FAA test procedure, outlined in the Civil Air Regulations, must be followed to obtain certification, but opined that the procedure was the bare minimum and that additional tests should be performed to ensure that an aircraft is safe. On the basis of this testimony, appellant argued that Beech failed to do all that it should have in testing the Baron. That, however, does not suffice to make out a section 402B case in this respect. Absent a representation by Beech that it conducted additional tests other than those required by the FAA, the failure of appellee to do anything more than that specified in the Civil Air Regulations is not actionable under section 402B.

ly reported the test flight results. Therefore, we find that the district court properly refused to submit a section 402B issue to the jury concerning any misrepresentation that Beech followed the procedure outlined in the Civil Air Regulations and that the Baron did not display undue spinning tendencies as that term is operationally defined in Regulation 3.123. *See Freimanis v. Sea-Land Serv., Inc.,* 654 F.2d at 1163 (noting that a " 'plaintiff has no right to the presentation of an instruction unsupported by the evidence adduced at trial' " (quoting *Beard v. Mitchell,* 604 F.2d at 497)).

### Instructions Concerning Section 402A Liability

Appellant argues that the district court erred by refusing to adequately charge the jury concerning Beech's duties and liability under section 402A of the *Restatement (Second) of Torts.*[14] He argues that the district court instructed the jurors on the products liability theory only in general terms rather than in a way calculated to "guide, direct, and assist them toward an intelligent understanding of the legal and factual issues." In particular, appellant argues that the district court erred by refusing to specifically instruct the jury that a product can be found defective even without proof of a specific defect, that the FAA's Civil Air Regulations are merely minimum standards for airworthiness and do not constitute a defense under section 402A, that the manufacturer has a continuing duty to remedy a defect or provide adequate warnings and instructions, and that the manufacturer's warnings must be sufficiently detailed to apprise the consumer of the nature and extent of the danger which use of the product entails.[15] Beech argues, in turn, that the instructions con-

sidered as a whole were adequate and that certain of appellant's requested instructions were wrong as a matter of law.

■ On appeal, our concern is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether the instructions furnished the jury an adequate understanding of the issues and its duty to determine them. *Robert v. Conti Carriers & Terminals, Inc.,* 692 F.2d 22, 24 (5th Cir.1982); *Wright v. Wagner,* 641 F.2d 239, 242 n. 4 (5th Cir.1981); *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1178 (5th Cir.1982), *cert. denied sub nom. Bintliff v. Chemetron Corp.,* 460 U.S. 1007, 103 S.Ct. 1254, 75 L.Ed.2d 476 (1983); *Smith v. Borg-Warner Corp.,* 626 F.2d 384, 386 (5th Cir.1980). "A party is entitled to reversal for a district court's failure to give a particularly requested instruction only if the jury was misled by the instructions that were actually given. The court is under no obligation to couch the charge in terms requested by counsel." *Wyatt v. Penrod Drilling Co.,* 735 F.2d 951, 955 (5th Cir. 1984); *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 425 (5th Cir.1985) (quoting *Wyatt*). Considering appellant's arguments in light of this standard, we find that they present no reversible error.

### *Specific Defect*

Appellant notes that while substantial evidence concerning the Baron's tendency to enter into a flat spin was introduced at trial, no proof could be offered that pinpointed the specific flaw or flaws in the design of the aircraft which created this dangerous characteristic. He argues that the district court should have instructed the jury that proof of the defect could be made by circumstantial evidence and that

---

14. *See note 3, supra.*

15. The district court, in an affidavit filed in the record (following judgment) by appellant together with "Plaintiff's Suggested Jury Instructions," stated that the document entitled "Plaintiff's Suggested Jury Instructions" was presented to the court "prior to the preparation of the

Court's charge to the Jury and were requested by plaintiff to be included therein." The court further stated that each lawyer made timely objections to each rejected instruction, and that the court made its final ruling prior to argument "that the omitted instructions and issues should not be given."

the Baron could be found defective and unreasonably dangerous even though no specific defect was established.[16] Absent this instruction, he contends, the jury could have concluded that appellant failed to meet his burden of proof of establishing that the airplane was a defective product.

██ Appellant is correct in arguing that for a product to be found defective it is not always necessary that there be proof of a specific, particular underlying defect. *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349–50 (Tex.1977) (Reavley, J.) ("If the plaintiff has no evidence of a specific defect in the design or manufacture of the product, he may offer evidence of its malfunction as circumstantial proof of the product's defect."). However, we are unable to conclude that the district court's failure to expressly and specifically instruct the jury that appellant only needed to prove that the product as a whole was defective, and that he did not need to prove the existence of a particular defect, misled or inadequately guided the jury in this respect. Nothing in the charge even suggests that a specific or particular defect had to be shown. To the contrary, under the first interrogatory the jury was asked whether "[d]efective design *of the aircraft*" was a "producing cause of the accident in question." The interrogatory correctly required the jury to consider only whether the *aircraft* had been shown to be defectively designed, not whether any specific or particular defect in it had been identified and proven. And, the jurors were also instructed that they "may make deductions and reach conclusions which reason and common sense lead you to draw from the facts established by the testimony

and evidence in the case." It does not appear that "the jury was misled by the instructions that were actually given." *Wyatt*, 735 F.2d at 955.

Moreover, the charge correctly states the Texas substantive law. The jurors in the instant case were instructed by the district court that " '[d]efective design' of a product is a design of a product that renders the product unreasonably dangerous taking into consideration the utility of the product and the risk involved in its use." This charge is almost verbatim with the language of *Texas Pattern Jury Charges*, which states:

"**Design Defect**

"A 'defectively designed' product is a product that is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." 3 *Texas Pattern Jury Charges*, PJC 71.02, at 217 (1982).

The Supreme Court of Texas, discussing "Volume III of the Texas Pattern Jury Charges (1982)," has stated,

"We explicitly approve the Pattern Jury Charges issue and instruction for design defect cases, and disapprove the addition of any other instructions in such cases, however correctly they may state the law under § 402A of the Restatement (Second) of Torts." *Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex.1984).

The district court's decision whether to use form or pattern instructions is governed under federal law, since it involves the manner and method of instructing the jury as opposed to the substance of the instruction.[17] However, the issue of what consti-

---

**16.** Plaintiff's Suggested Jury Instructions included the following:

"A manufacturer who sells a product with a high risk of human harm is legally obligated to provide specific instructions and warnings so that it is reasonably safe for all foreseeable uses....
" ....
"The warning must designate specifically all the dangers that may cause serious injury. A general warning that the product is dangerous is insufficient.... A simple directive warn-

ing or instruction, i.e., 'Do not use in the following manner ...', may be inadequate without some indication of the consequences of failing to follow the directive. The physical aspect of the warnings or instructions, their conspicuousness, prominence, relative size of print, etc. must be adequate to alert an average person to the danger involved." (Citations omitted.)

**17.** State law governs the substance of jury instructions in a diversity case, while the manner of instructing the jury is governed by federal

tutes a "defectively designed" product is a matter of substantive state law. The *Acord* court, by applying its imprimatur to the statement of law contained in *Texas Pattern Jury Charges*, has approved the definition of "defectively designed" product which the district court used in its charge. We do not believe that the district court's instruction, which tracks the language of the court-approved pattern jury charges, constitutes reversible error simply because it did not go into the detail which appellant urged. "The trial judge is not required to give a flawless instruction suitable for publication in a treatise." *Robert,* 692 F.2d at 24. Finding no reason to believe that the jury was in some way misled or lacked a sufficient understanding of the issue, we hold that appellant's complaint in this respect presents no reversible error. *Id.; Wright,* 641 F.2d at 242 n. 4; *Chemetron,* 682 F.2d at 1178.

*FAA Regulations*

█ Appellant notes that Beech emphasized at trial that the FAA's 1956 Civil Air Regulations, which established the certification standards applicable at the time the Baron was flight tested, did not require the company to spin test the Baron. Appellant argues that the jury accordingly should have been instructed that the Civil Air Regulations are merely a minimum standard for airworthiness, and that compliance with the regulations is not a defense to a section 402A action but rather is only one of the elements the jury may consider in determining whether the Baron was defective in an unreasonably dangerous way.[18] Because the court omitted this instruction, appellant contends, "the jury could have concluded that Beech was under no duty to spin test the Baron" and that mere compli-

ance with FAA regulations precluded a finding that Beech was liable for the crash.

We are unable to conclude that the jury was likely misled into believing that mere compliance with the FAA regulations constituted a defense to a section 402A action. Nothing in the court's charge so suggested. Counsel for appellant told the jury during his summation that it could find that the airplane was defective even if Beech had complied with the FAA standards. Beech's counsel did not dispute this argument. Appellant's counsel told jurors during closing argument:

"They didn't spin test it either. They say: 'Oh, well, we didn't have to. The FAA didn't make us. Besides, it's too dangerous for our test pilots to do it.'

"Think about that one for a while. It seems like to me that is all the more reason they ought to have done it if it is that dangerous. They tested other planes. They tested their Travel Air and they tested the Duchess, six turns. The FAA didn't make them do that. No requirement to do that. It is certified under the same regulations. It is placarded; no spins, no requirement, and yet they did it. The[y] spun it six times.... Did they do it on the Baron? Did they go back and say look at all these people that are being killed in these flat spins. Maybe we ought to go back and test this Baron with a model of this or that or whatever it takes to do it and see if we can't find out what is wrong with it and see if we can't correct it and see if we can't do what Piper did? Oh, no, to heck with the people out there already flying them. What we want to do, we are concerned about the ones we haven't sold yet. We are going to test *it* (emphasis in original transcript) and they did.

law. *Foster v. Ford Motor Co.,* 621 F.2d 715, 717 (5th Cir.1980); *Chemtron Corp. v. Business Funds, Inc.,* 682 F.2d at 1178; *see also* 9 C. Wright & A. Miller, *Federal Practice and Procedure-Civil* § 2555, at 651 (1971).

**18.** Plaintiff's Suggested Jury Instructions requested the following instruction:
"Evidence has been received of Government regulations bearing on the criteria the manu-

facturer must meet as to the flight characteristics of the aircraft. This is a minimum standard. If you find that the aircraft failed to meet any such standard, then as a matter of law the aircraft was defective and unreasonably dangerous. However, if the aircraft did meet any such standard, this is not a defense, but only one of the elements you could consider."

"Then they want to stand here and say, 'well, we didn't know how to test the Baron, we couldn't do it and nobody made us and everything else.' I submit to you that they could but they didn't because they are more concerned with selling airplanes than they were the safe use of those they had already sold. Otherwise, there is no justification for not trying to do something with the Baron that they had built and sold when they didn't know what its spin characteristics were . . . .

" . . . .

" . . . *I think it ought to be pretty apparent the FAA is not going to force them to do anything. You may be able to with your verdict.*

"*By your verdict, you call tell Beech that the people in San Antonio don't like this kind of corporate irresponsibility or immorality or whatever you want to call it.*" (Emphasis added.)

We find no indication in the record that Beech ever suggested to the jury that Beech's compliance with FAA regulations, of itself, precluded the jury from finding that the airplane was defective in an unreasonably dangerous way. In light of appellant's uncontradicted argument that the jury *could* find that the plane was defective in spite of compliance with the FAA, the lack of any contrary suggestion in either the charge or appellee's presentation, and the fact that the charge defined defective design in terms of unreasonable dangerousness, considering risk and utility, without any reference to regulatory compliance, we find no basis from which the jury could have reached the conclusion that such compliance alone was a defense. *See Freimanis*, 654 F.2d at 1163–64 (" '[T]he refusal [of an instruction] will not be reversible if the party's theory of the case was apparent throughout the course of the trial' . . . . [T]he appellant's theory of the case was apparent throughout the trial *and in the appellant's closing argument.* The jury could not have misunderstood either the law or the appellant's theory . . . ." (Emphasis added.)). *See also McNeese v. Reading and Bates Drilling Co.*, 749 F.2d 270, 274 (5th Cir.1985) (instructions to be assessed in consideration of "the pleadings, evidence and argument of counsel"); *Alexander v. Conveyors & Dumpers, Inc.*, 731 F.2d 1221, 1227 (5th Cir.1984) (failure to give requested instructions detailing factors to be taken into account in determining assumption of risk not error where "[c]ounsel had the opportunity to emphasize the matters in his favor contained in these proposed instructions during jury argument"). Therefore, we find that the omission of the requested instruction did not constitute reversible error.[19]

*Continuing Duty*

■ Appellant also argues that the district court should have instructed the jury

---

**19.** We note that appellant's requested instruction on the import of the FAA's Civil Air Regulations, *see* note 18, *supra,* would have informed the jurors, "If you find that the aircraft failed to meet any such standard [contained in the Civil Air Regulations], then as a matter of law the aircraft was defective and unreasonably dangerous." While not itself fatal to appellant's argument considered in the text, we believe this portion of the requested instruction misstated the relevant law, at least as applied to a type certification where (as here) there is no substantial evidence that the certification resulted from fraudulent misleading of the FAA by Beech. The determination whether the aircraft model satisfied the Civil Air Regulations was a matter wholly within the province of the FAA. It would have been improper for the jury to second-guess the FAA's decision that the Baron satisfied the FAA standard. In a case involving the issue whether the United States was liable

under the Federal Tort Claims Act for the alleged negligence of the FAA in certifying a model of aircraft, the Supreme Court held that the discretionary function exception to the Act precluded the negligence action. *United States v. S.A. Empressa de Viacao Aerea Rio Grandense,* 467 U.S. 797, 104 S.Ct. 2755, 2769, 81 L.Ed.2d 660 (1984). The Court explained that by creating the discretionary function exception,

"Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." 104 S.Ct. at 2765.

Although the instant case was not brought under the Federal Tort Claims Act, we nevertheless conclude that under the same rationale the jury should not be permitted to second-guess the soundness of the FAA's decision that a particular model of aircraft satisfied the Civil Air Regulations.

that Beech was under a continuing duty to warn of or remedy dangers that came to the company's attention after the product had been sold.[20] He argues that without this instruction, the jury may have judged the adequacy of Beech's warnings and instructions in light of the company's knowledge *at the time the airplane was first sold.* If the jury had been instructed concerning the continuing duty to warn, he argues, "it could have determined that based upon the knowledge Beech gathered *after* its product was sold, the warning in the manual was inadequate." (Emphasis added.)

We do not believe the district court's failure to charge the jury concerning Beech's continuing duty to warn of or remedy dangerous defects misled the jury into believing that it could consider Beech's knowledge only up through the time the company sold the airplane. The first interrogatory asked the jury to determine whether the "[f]ailure of Beech to give adequate warnings and instructions for the safe use of the aircraft" was a "producing cause of the accident in question." The interrogatory contained no express or implied limitation as to time. Its natural, as well as its literal, meaning permits of no such limitation. Similarly, the charge's definition of adequate warnings and instructions was in no way related either to the manufacturer's knowledge or the state of the art. Moreover, the jury heard evidence from *both* sides on developments which occurred *after* the sale of this particular airplane and *before* Rehler's accident and which pertained to Beech's notice of accidents and its efforts to provide updated instructions. Appellant was permitted to

introduce evidence concerning eleven accidents allegedly involving flat spins and all occurring after the sale of the Baron and prior to Rehler's death.[21] In connection with this evidence, appellant argued that Beech had knowledge of these accidents and yet still failed to test for or alleviate the undue spinning tendencies of the Baron, or warn consumers about this characteristic or how to recover from a spin. Beech itself presented Wayne Phillip Hunt, the manager of the Commercial Publications section of Beech, who testified that Beech mailed out a completely "re-formatted version of the existing [pilot's operating] manual" plus a safety information booklet to the owners of record of its airplanes, free of charge, on August 3, 1978; the mailout occurred after Beech's initial sale of this particular airplane in July 1974 but before Rehler's fatal crash in March 1979. This revised Pilot's Operating Handbook contained the warning that the Baron had not been spin tested and that the recovery procedure was based only on secondary information. The updated Pilot's Operating Handbook was introduced into evidence.[22]

We conclude that the jury could not have misinterpreted the instructions so as to believe that the adequacy of Beech's warnings and instructions was to be judged against Beech's actual or imputed knowledge up to but not beyond the time the airplane was first sold. *See Freimanis,* 654 F.2d at 1163–64.

*Extent and Adequacy of Beech's Warning*

■ Appellant also contends that the district court erred by refusing to instruct the jury that a manufacturer may not rely on

---

**20.** Appellant requested the following instruction:

"If after a product has been sold and dangerous defects in design have come to the manufacturer's attention, the manufacturer has a continuing duty either to remedy these or, if complete remedy is not feasible, at least to give users adequate warnings and instructions concerning methods for minimizing the danger."

**21.** Appellant introduced into evidence a chart listing twenty-three accidents involving Beech

aircraft, all supposedly caused by flat spins, which occurred from October 9, 1970 to February 19, 1980. The chart showed eleven accidents occurring from August 29, 1974 (after the initial sale of the Baron to Chaparral Aviation) to March 2, 1979 (before decedent's accident).

**22.** The district court instructed the jury that it could "consider the testimony of all the witnesses regardless of who may have called them and all of the exhibits received in evidence regardless of who may have produced them."

other parties to warn of the dangers in its product, but must itself support an adequate warning; that the manufacturer must warn of dangers that may arise from foreseeable misuse or mishandling of a product; that the warning must specifically set forth the nature of the particular dangers involved; and that the degree of warning required of the manufacturer depends on the magnitude of danger that its product involves.[23] Beech replies that the definition of "adequate warnings and instructions" which the district court submitted to the jury tracks the language of the approved *Texas Pattern Jury Charges,* and correctly states Texas substantive law. It further argues that the instructions requested by appellant would not have significantly added to the jury's understanding of the issues involved in this case. We hold that the instructions, in the respects complained of, were neither incorrect nor inadequate, and that appellant's contentions present no reversible error.

The "Comment" to 3 *Texas Pattern Jury Charges* PJC 71.04 (1982) states:

"[T]he Committee [on Pattern Jury Charges] has prepared the following instructions:

" 'Adequate warnings and instructions' means warnings and instructions that are given in such form that they could reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of its use; and the content of the warnings and instructions must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person." PJC 71.04 at 238.

The district court tracked the language of the pattern charge, instructing the jury as follows:

" 'Adequate warnings and instructions' means warnings and instructions sufficient to convey to the reasonably prudent pilot the nature and extent of the dangers involved in the use of the aircraft and how to avoid the dangers."

As noted above, the Supreme Court of Texas has approved the pattern instructions contained in *Texas Pattern Jury Charges* as a correct statement of the state's substantive law. *Acord,* 669 S.W.2d at 116. Therefore, the instruction "actually given" accurately states Texas law concerning the definition of "adequate warnings and instructions." *Wyatt,* 735 F.2d at 955.

We reject appellant's arguments that the district court's failure to provide additional instructions misled the jury. Respecting the complaint that the jury was not told that the manufacturer must itself provide an adequate warning, rather than relying on third parties to do so, we observe that the first interrogatory asks only whether the "[f]ailure *of Beech* to give adequate warnings and instructions for the safe use of the aircraft" was "*a* producing cause of

---

**23.** Appellant requested the following charge:

"The product can be defective in design without any ascertainable defect or impurity and although it was manufactured precisely as it was intended to be. . . .

" . . . .

"The manufacturer is held to the knowledge and skill of an expert. The manufacturer's status as an expert means that at a minimum, it must keep abreast of the scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. . . .

"The manufacturer has a duty to test, analyze and inspect its product. The extent of the manufacturer's duty to test its product must be commensurate with the dangers involved. The manufacturer is charged with knowing what proper tests would have ·revealed. . . .

"The manufacturer may not rely on others to warn of the dangers in its product, but must bear the burden of showing that its own conduct was proportionate to the scope of its duty. . . .

" . . . .

"The degree of warning or instruction depends upon the degree of danger; a greater degree of danger requires a greater degree of warning or instruction. . . .

"To comply with this duty the manufacturer must give due consideration to the likelihood of accidents and the seriousness of the consequences from failure to warn or instruct. The manufacturer must warn of any dangerous propensities that are inherent in the product or its use or that may arise from the improper handling or use of the product if this improper use is reasonably foreseeable."

the accident in question." [24] (Emphasis added.) The interrogatory frames the issue in terms of adequate warnings by *Beech*, rather than in terms of whether the decedent had *received* adequate warnings and instructions from whatever source or sources. Adequate warnings were defined as those "sufficient to convey" the nature and extent of the dangers and how to avoid them. In sum, the jury was asked if *Beech's* warnings and instructions were not "sufficient to convey" the nature and extent of the dangers and how to avoid them, and if any such deficiency in *Beech's* warnings and instructions was *a* producing cause of the accident. There was no mention of third-party warnings, actual or potential. The charge is neither prejudicially misleading nor inadequate in the respect complained of.

Appellant contends that the jury should have been instructed that the thoroughness of the required warning depends on the extent of the dangers posed and that the warning must specify the particular dangers involved. However, the jury was told that for a warning to be adequate it had to be "sufficient to convey" both the *"nature"* and *"extent"* of the "dangers" involved; instructions had to sufficiently convey *"how* to *avoid* the dangers." This adequately encompasses the several concepts urged by appellant in this connection so that the charge presents no reversible error in respect thereto.

It is further claimed that the instructions were deficient in failing to state that the duty to warn extended to dangers that might arise from foreseeable misuse or mishandling. However, the form of submission plainly reflected that causative pilot negligence was in no sense inconsistent with causative inadequate warnings or instructions—it clearly shows that the jury is authorized to find the latter even though it concludes that the former represented the preponderant reason for the crash. Moreover, the instructions given placed no "misuse" or similar limitations on the character of "the dangers involved in the use of the aircraft" which must be warned against. While the type of warning of those dangers was geared to what was "sufficient to convey" them "to the reasonably prudent pilot," this was a proper statement of the law. As we said in *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338–39 (5th Cir.1984): [25]

> "Since the warning is intended to be adequate for the *'average user'* of the product, the adequacy of the warning must be evaluated together with the knowledge of the ultimate users of the product. *Where, for example, a product is marketed solely to professionals experienced in using the product, the manufacturer may rely on the knowledge which a reasonable professional would apply in using the product. See Martinez [v. Dixie Carriers, Inc.],* 529 F.2d [457] at 465–67 [5th Cir.1976] .... Where, however, the product is marketed to the general public, the manufacturer must tailor the warning to the man-in-the-street, *Borel [v. Fiberboard Paper Products Corp.],* 493 F.2d [1076] at 1092–93 [*cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)] ...." (Emphasis added.)

The instructions were neither incorrect nor prejudicially incomplete or misleading in the respect complained of. We also observe that appellant argued to the jury, without objection, his theories in this regard,[26] and that Beech did not argue that

---

**24.** "Producing cause" was defined as follows: "Producing cause means an efficient, exciting or contributing cause which in a natural sequence produced the events in question. There can be more than one producing cause."

**25.** While *Pavlides* was a maritime law case, we there specifically relied on Texas authorities and observed that we applied "the same rule as

is applied in Texas courts." 727 F.2d at 338 & n. 14.

**26.** *See, e.g.,* the following portion of appellant's jury argument:

> "It is true that most multi-engine airplanes will stall or spin. *Pilots may contribute* in many many ways, *usually* unintentionally, but even if they do, I submit to you the penalty

warnings and instructions did not have to address dangers posed by foreseeable pilot error. We find *no reversible error in regard* to this asserted deficiency in the charge.

### Pilot Negligence

Appellant asserts the evidence is insufficient to support the jury's finding that decedent was negligent in the operation of his airplane. Although we are inclined to believe that the evidence is not insufficient in this respect, we find it unnecessary to reach that question. The judgment for Beech is required by the jury's "We do not" answers to parts a and b of the first interrogatory, establishing that no defective design of the aircraft was a producing cause of the accident and that no failure of Beech to give adequate warnings and instructions was a producing cause. These answers are independent of any finding as to the presence or absence of pilot negligence.[27] Appellant did not object to the submission of part c, inquiring of pilot negligence, of the first interrogatory.[28] Even if the jury had answered "We do not" to part c, thus finding no pilot negligence, as appellant contends it should have, nevertheless Beech would still be entitled to judgment on the verdict. *See Neubauer v. City of McAllen,* 766 F.2d 1567, 1577 & n. 10 (5th Cir.1985). Under these circumstances, it is unnecessary to reach appellant's contention that there is no evidence of pilot negligence.[29]

> shouldn't be death. Single engine stalls are not recommended. No one argues that. . . .
> " . . . I submit to you that it is unreasonable that a general aviation aircraft did [not] allow a pilot, even if he makes a mistake, a reasonable chance to save himself, give him time to recover in what that airplane does and what its design is and give him a way to recover."

27. Although the verdict form stated, respecting the first interrogatory, "Your percentage must total 100%," this applied only to the parts of that interrogatory which the jury answered "We do." The jury was plainly free to answer "We do not" to all three separate parts of the interrogatory. On the verdict form, the introductory portion of the first interrogatory asks, "Which of the following, *if any,* do you find from a preponderance of the evidence was a producing cause of the accident" (emphasis added). The verdict form's instruction for answering the three separate parts of the first interrogatory likewise states, "ANSWER 'We do' and the percentage, or 'We do not' as to each." This calls for a percentage answer *only* as to a part answered "We do," and does not prevent all three parts from being answered "We do not." This was likewise explained in the following portion of the court's oral instructions respecting the verdict form:

> "There is a little instruction that says, 'Answer "We do" and the percentage or "We do not" as to each.['] Your percentages must total one hundred percent.
> " 'A: Defective design of the aircraft, blank.' The blank is for your answer. If you find 'We do,' you write that, your foreman writes that in. Then you find the percentage of which the design, by which the design caused the accident, you write that in. If you do not find, then write in the words 'We do not.' That is the answer to that part.

> "Then part B says: 'Failure of Beech to give adequate warnings and instructions for the safe use of the aircraft.' Another blank, the same way from the evidence, and C is: [']Pilot negligence.' Then there is a blank for that. Answer it in the same way, either 'We do' with a percentage or 'We do not.' "

Neither party has ever taken the position, either in the court below or on this appeal, that the instructions or verdict form called for a percentage determination as to a part answered "We do not" or that the jury could not have answered, consistently with the instructions and verdict form, "We do not" to all three parts of the first interrogatory. Nor were any objections made to this aspect of the first interrogatory or the verdict form.

28. Indeed, appellant does not complain on appeal of the *submission,* as such, of part c of the first interrogatory. We also observe that appellant made no motion for directed verdict or for judgment n.o.v. in regard to pilot negligence (or any other matter).

29. Similarly, we do not address appellant's complaints that the district court erred in failing to submit exemplary damages to the jury and that there is insufficient evidence to support the jury's finding of no actual damages (the latter contention being raised for the first time on appeal). Since the jury's "We do not" answers to parts a and b of the first interrogatory establish that Beech is not liable, appellant is not in any event entitled to recover any actual or exemplary damages from Beech. We also observe that we have evaluated the instructions here given, and those requested and refused, only from the point of view of determining whether the complaints raised on this appeal in respect thereto present reversible error; we give no blanket approval to any of these instructions as

## CONCLUSION

For the foregoing reasons, the judgment below is affirmed.

**AFFIRMED.**

against other possible complaints in different contexts which we have not expressly addressed.